**LEGAL ENVIRONMENTAL ASSISTANCE FOUNDATION, INC.,**
Plaintiff–Appellant,

v.

**BOARD OF COUNTY COMMISSIONERS OF BREVARD COUNTY, FLORIDA,**
Defendant–Appellee.

No. 92–3200.

United States Court of Appeals,
Eleventh Circuit.

Jan. 12, 1994.

David A. Ludder, Barbara Sue Ruhl, Legal Environmental Assistance Foundation, Inc., Tallahassee, FL, for plaintiff-appellant.

Nina Boniske, Brevard County Attorney's Office, Melbourne, FL, for defendant-appellee.

Before TJOFLAT, Chief Judge, BIRCH, Circuit Judge, and HENDERSON, Senior Circuit Judge.

**PER CURIAM:**

CERTIFICATION FROM THE UNITED STATES COURT OF APPEALS FOR THE ELEVENTH CIRCUIT TO THE SUPREME COURT OF FLORIDA PURSUANT TO ARTICLE 5, SECTION 3(b)(6) OF THE FLORIDA CONSTITUTION.

TO THE SUPREME COURT OF FLORIDA AND ITS HONORABLE JUSTICES:

This case comes to the United States Court of Appeals for the Eleventh Circuit on appeal from the United States District Court for the Middle District of Florida. It involves a question of Florida law that is determinative of the cause, but unanswered by controlling precedent of the Supreme Court of Florida. We therefore certify this question for resolution by the highest court of Florida.

## I. BACKGROUND

In 1974, Congress enacted the Safe Drinking Water Act ("SDWA"), Pub.L. No. 93–523, 88 Stat. 1660 (codified as amended at 42 U.S.C. §§ 300f *et seq.* (1988)), which empowers the Environmental Protection Agency ("EPA") to regulate the underground injection of wastewater. The SDWA established a regulatory program to be administered by the EPA or a state if the EPA approves the state underground injection control ("UIC") program. Congress established several minimum requirements for state UIC programs, including the requirement that underground injection be prohibited unless authorized by permit.

On February 7, 1983, the EPA Administrator published in the Federal Register his approval of the UIC program of the Florida Department of Environmental Regulation ("FDER"). 48 Fed.Reg. 5556 (1983). The Florida UIC program, as approved by the EPA Administrator in 40 C.F.R. § 147.500 (1992), includes the following provisions of Florida law: The Florida Air and Water Pollution Control Act, Fla.Stat.Ann. ch. 403.-011–.90 (West 1973 & Supp.1983); The Florida Administrative Procedure Act, Fla.Stat. Ann. ch. 120 (West 1982 & Supp.1993); Fla.Admin.Code Ann. ch. 17–4 (1982) (Permits); and Fla.Admin.Code Ann. ch. 17–28 (1989) (Underground Injection Control).

On December 21, 1982, the appellee, the Board of Commissioners of Brevard County, Florida ("the Board"), applied to the FDER for a Class I Exploratory Well Construction and Testing Permit[1] for the South Beaches Regional Wastewater Treatment Plant. Approximately one year later, on December 23, 1983, the FDER issued the Board Permit No. UD05–64536, for construction of a Class I Exploratory Test Injection Well at the South Beaches facility.[2] Although the permit had an initial expiration date of January 1, 1985, the expiration date was modified several times and finally extended to December 20, 1988.

---

1. A Class I injection well includes "municipal ... disposal wells which inject fluids beneath the lowermost formation containing, within one quarter mile of the well bore, an underground source of drinking water." Fla.Admin.Code Ann. r. 17–28.130(1)(a)2 (1990). The Florida Administrative Code authorizes three types of permits for Class I injection wells: (1) Class I—Exploratory Well Construction and Testing Permit; (2) Class I—Test/Injection Well Construction and Testing Permit; and (3) Class I—Injection Well Operating Permit. *See* Fla.Admin.Code Ann. r. 17–28.320, 17–28.330, 17–28.340.

2. The permit provided that water for testing could come only from the Indian River, and it prohibited the injection of sewage effluent.

On December 29, 1986, prior to the expiration date of the Construction and Testing Permit, the Board applied to the FDER for a Class I Injection Well Operating Permit. In a letter dated February 26, 1987, while the application for the Operating Permit was still pending, the FDER confirmed its earlier verbal approval to the Board to begin using the well for injection of treated domestic wastewater (sewage). As of the date of oral argument in this appeal, however, the FDER had failed to act on the Board's application for an Operating Permit.[3]

The appellant, the Legal Environmental Assistance Foundation, Inc. ("LEAF"), filed this action in the United States District Court for the Middle District of Florida, alleging that the Board has been operating its South Beaches facility without a permit since December 21, 1988, in violation of the SDWA. The Board responded by arguing that its Construction and Testing Permit continues to be effective during the period that its application for the Operating Permit is pending. The district court granted the Board's motion for summary judgment, holding that the Construction and Testing Permit continues in effect until the FDER acts upon the Board's application for an Operating Permit. LEAF timely filed this appeal.

## II. DISCUSSION

The resolution of this appeal requires the interpretation of several provisions of Florida law. Under the authority of the SDWA, the EPA has issued regulations setting forth the minimum requirements for state-administered UIC programs. Included in these regulations is the following provision:

A State authorized to administer the UIC program may continue either EPA or State-issued permits until the effective date of the new permits, *if State law allows.* Otherwise, the facility or activity is operating without a permit from the time of expiration of the old permit to the effective date of the State-issued new permit.

40 C.F.R. § 144.37(d) (1992) (emphasis added). The district court determined that the resolution of this case depends on whether existing Florida law provides for the continuation of a Construction and Testing Permit during the time that the application for an Operating Permit is pending. Consequently, the district court focused on several provisions of *existing* Florida law, rather than limiting its inquiry to the provisions of Florida's EPA-approved UIC program.

The court first examined section 120.60(6) of the Florida Administrative Procedure Act, which deals with licenses. That section provides, in pertinent part:

When a licensee has made timely and sufficient application for the *renewal* of a license which does not automatically expire by statute, the existing license shall not expire until the application has been finally acted upon by the agency or, in case the application is denied or the terms of the license are limited, until the last day for seeking review of the agency order or a later date fixed by order of the reviewing court.

Fla.Stat.Ann. § 120.60(6) (West Supp.1993) (emphasis added). LEAF argues that this provision must be limited to the plain meaning of its language. Because the Board is applying for a different type of license, rather than a renewal of its existing license, LEAF contends that section 120.60(6) is inapplicable.

LEAF points to the legislative history of section 120.60(6) for support of its position. An earlier version of the bill that became section 120.60 contained language allowing extension of existing permits when a licensee has made a timely application for renewal of a license or "for a new license with reference to any activity of a continuing nature." *See* Appellant's Brief at 25–29 (discussing legislative history of section 120.60). LEAF argues that the omission of this language from the final version of section 120.60 evidences the legislature's intention that the statute cover

3. The Board contends that, as part of the processing of this application, the FDER has continually requested additional data, sampling, and monitoring for the South Beaches facility. In order to furnish this data, the Board maintains that it has been required to continue operating the underground injection well. The appellant disputes these contentions.

only applications for *renewal* of existing licenses, not applications for new licenses.

The Board responds that the statutory language may reasonably be interpreted to allow an extension of the Board's Construction and Testing Permit in the instant case. First, the Board contends that the omission of the above-cited language from the final version of the statute does not necessarily evidence a legislative intent that the statute apply only to renewals of the same type of permit. Second, the Board points out that its Construction and Testing Permit does contain an operating component. Not only does the permit itself provide for a limited period of operation for testing purposes, but the Board received written permission from the FDER to begin injection of wastewater. The Board, therefore, argues that its application for an Operating Permit can be construed as an application for a renewal of the operating component of its existing license.

The district court next focused on another provision of Florida law. As stated earlier, one component of Florida's UIC program that was approved by the EPA is Fla.Admin.Code Ann. ch. 17–4 (1982), which deals with permits. Rule 17–4.09(1) of that chapter provided in its entirety as follows: "Prior to sixty days before expiration of any Department permit, the permittee shall apply for a renewal of a permit on forms and in a manner prescribed by the Department." Fla.Admin.Code Ann. r. 17–4.09(1) (1982). This rule, however, was amended on August 31, 1988 and renumbered as rule 17–4.090(1). The amended rule contains the following additional language:

> When the application for renewal is timely and sufficient, the existing permit shall remain in effect until the renewal application has been finally acted upon by the Department or, if there is court review of the Department's final agency action, until

a later date is required by Section 120.60, F.S.

Fla.Admin.Code Ann. r. 17–4.090(1) (1990). Although certain amendments to chapter 17–4 have been approved by the EPA as part of Florida's UIC program, the amended rule 17–4.090 has yet to receive EPA approval. LEAF thus argues that the amended rule 17–4.090 should not be considered by the court in deciding this case.[4] The Board responds that the proper inquiry in this case is whether *existing* Florida law provides for the extension of the Board's permit and that EPA approval of the amendments is irrelevant.[5]

The Board heavily relies on the FDER's interpretation of Florida law dealing with the extension of permits. On several occasions,[6] including several affidavits filed in the present case, officials of the FDER have unequivocally stated that Florida law allows for the continuation of an existing Construction and Testing Permit past the expiration date when the licensee has timely applied for an Operating Permit. The Board cites several cases highlighting the substantial deference that courts give to an agency's interpretation of the rules it is charged with administering. *See Bolam v. Mobil Oil Corp.*, 893 F.2d 311, 313 (11th Cir.1990) (per curiam); *Pan Am World Airways, Inc. v. Florida Pub. Serv. Comm'n*, 427 So.2d 716, 719 (Fla.1983). In its order, the district court also relied heavily on the FDER's interpretation of these regulations.

LEAF challenges the district court's reliance on the FDER interpretation on several grounds. First, LEAF argues that the FDER's interpretation is based in part on the amended rule 17–4.090(1). *See* Fla.Admin.Code Ann. r. 17–4.090(1) (1990). Because this amendment has never been approved by the EPA as part of Florida's UIC program, LEAF argues that the FDER

---

**4.** LEAF also argues that the plain language of rule 17–4.090(1), like that of section 120.60(6) of the Florida Administrative Procedure Act, precludes its application in the present case.

**5.** The Board also contends that LEAF failed to raise this issue before the district court. We find substantial support in the record, however, that LEAF adequately presented this issue below.

**6.** For example, a February 4, 1991 legal opinion, issued by the FDER's Office of General Counsel in a case similar to the instant case, stated that "[a]pplying for an operation permit can be considered seeking 'renewal' of a construction permit." *See* R–1–23, Ex. IV.

should not have considered the new language in deciding whether continuation of the permit was proper. According to LEAF, the FDER and the district court should have focused only on whether continuation of the permit was authorized under Florida's UIC program, *as approved by the EPA*.

Second, LEAF argues that the FDER's interpretation is not entitled to deference to the extent it is based on section 120.60(6) of the Florida Administrative Procedure Act. Florida decisions have held that a court should only give deference to an agency's interpretation of regulations *that it is charged with administering*. E.g., *Raffield v. State*, 565 So.2d 704, 706 (Fla.1990), *cert. denied*, 498 U.S. 1025, 111 S.Ct. 674, 112 L.Ed.2d 666 (1991). LEAF argues that the Florida Administrative Procedure Act applies to all administrative agencies in Florida, and the FDER has no special expertise in interpreting that body of law. Therefore, LEAF contends that the FDER's interpretation of Fla.Stat.Ann. § 120.60(6) is not entitled to special deference.

Accepting, *arguendo*, LEAF's view of the issues, the only FDER interpretation of Florida law that would be entitled to special deference is its interpretation of the former Fla.Admin.Code Ann. r. 17–4.09 (1982), which is part of Florida's EPA-approved program and which falls under the ambit of the FDER. As noted earlier, that provision contains no language addressing the continuation of existing permits during the application for renewals or new permits.

LEAF's basic argument with respect to the district court's reliance on the FDER interpretation may thus be summarized as follows: First, the FDER interpretation is not entitled to special deference to the extent it is based on section 120.60(6) of the Florida Administrative Procedure Act, because the FDER has no special expertise interpreting that act. Second, the FDER interpretation is improperly based in part on the amended rule 17–4.090(1), because that provision is not part of Florida's EPA-approved UIC program. Therefore, the only relevant provision of Florida law for which the FDER interpretation would be afforded special deference is its interpretation of the former rule 17–

4.09(1). And because that provision contained no language addressing the continuation of licenses, the FDER could not reasonably interpret it to allow continuation in the instant case.

The district court rejected LEAF's position and granted summary judgment for the Board. Relying heavily on the FDER's interpretation, the court held that, "under Florida law, the Board's construction and testing permit continues in effect at least until FDER acts upon the Board's application for an operation permit." District Court Order at 6. The district court did not address LEAF's argument that the agency's interpretation is not entitled to deference to the extent it is based on section 120.60(6) of the Florida Administrative Procedure Act. The court did, however address LEAF's argument with respect to the FDER's reliance on the amended rule 17–4.090(1). The court held that the relevant inquiry was "whether *existing* Florida law allows FDER to extend the duration of the construction and testing permit." *Id.* Therefore, the court held that the FDER was not limited to the EPA-approved UIC program in making its determination and could consider Florida laws that are not part of the UIC program.

We agree in part with the district court's analysis. Although the district court did not address the issue, we agree with LEAF that the FDER interpretation is not entitled to deference to the extent it is based on section 120.60(6) of the Florida Administrative Procedure Act. The Florida Administrative Procedure Act applies to all Florida administrative agencies, and the FDER has no special expertise in interpreting it. Therefore, we believe that under established Florida rules of statutory construction, the FDER interpretation should not be afforded special deference. We concede, however, that this issue is one of state law and we leave it to the Florida Supreme Court to decide as part of this case.

We agree with the district court, however, that the FDER is not limited to the UIC program in determining whether the Board's Construction and Testing Permit may be extended. In making this determination, the FDER should interpret all relevant

Florida law, including the amended rule 17–4.090(1).

We base this finding on section 144.37(d) of the EPA regulations promulgated under the SDWA. *See* 40 C.F.R. § 144.37(d) (1992). As noted earlier, the SDWA authorized the EPA to issue regulations setting forth the minimum requirements for state-administered UIC programs. Section 144.37(d) of those regulations authorizes the continuation of existing permits during the application for new permits. Section 144.37(d), however, is not included among the provisions that *must* be included in state UIC programs. *See* 40 C.F.R. § 145.11(a) (1992). Instead, the regulations provide that section 144.37(d) *may* be implemented as part of a state's UIC program. *See id.* § 145.11(b)(2). Therefore, although state UIC programs *must* prohibit underground injection unless authorized by permit, section 144.37(d) provides that "[a] State authorized to administer the UIC program *may* continue either EPA or State-issued permits until the effective date of the new permits, if State law allows." *Id.* § 144.-37(d) (emphasis added).

We believe that section 144.37(d) stands alone as authorization for the continuation of permits if state law allows, regardless of the state's UIC program. The phrase, "if State law allows," refers to all existing state law, not merely the EPA-approved UIC program.[7] Section 144.37(d) refers to a "state authorized to administer the UIC program," not to the UIC program itself. If the drafters of the regulations had intended to say that a state *UIC program* may provide for

continuation of existing permits, we believe that they would have said so.[8] Instead, the regulation refers to a *state* authorized[9] to administer the UIC program. The language of the regulation thus convinces us that section 144.37(d) is a blanket provision permitting any state that gains EPA approval of its UIC program to later grant extensions of permits if such extensions are allowed under state law, including, but not limited to, the state's UIC program.

We thus affirm the district court's holding that the proper inquiry in this case is whether continuation of the Construction and Testing Permit was authorized under existing Florida law, including the amended rule 17–4.090(1). Because this issue requires interpretation of federal regulations, namely 40 C.F.R. § 144.37(d), we believe it is proper for our determination. We thus hold that under the EPA regulations the FDER acted properly by basing its interpretation on existing Florida law, including the amended rule 17–4.090(1). Whether the agency's interpretation of section 120.60(6) of the Florida Administrative Procedure Act is entitled to deference is an issue of state law, which we do not decide.[10]

■■■ We believe that the remaining issue is a question of state law, and we are aware of no decision in Florida that has addressed this issue. We therefore certify the following question:

UNDER EXISTING FLORIDA LAW, NOT LIMITED TO THE STATE'S EPA–APPROVED UNDERGROUND INJEC-

---

7. Under LEAF's interpretation of the phrase, the provision would be reduced to the tautology that a state may provide for continuation of permits if its UIC program allows. We are reluctant to interpret a provision in a manner that will render one of its parts inoperative or superfluous. *See Gonzalez v. McNary*, 980 F.2d 1418, 1420 (11th Cir.1993).

8. In other places, the EPA regulations refer specifically to the "UIC program" when setting forth minimum requirements. *E.g.,* 40 C.F.R. § 144.-11. Moreover, the introduction to the EPA regulations provides separate definitions for "State" and "UIC program." *Id.* § 144.3. We must therefore infer that the drafters of the regulations did not intend for the terms to be interchangeable.

9. The drafters' use of the word "authorized," in the past tense, also convinces us that this provision refers to states, rather than UIC programs. A state is not authorized to administer the UIC program until its program has been approved by the EPA. Therefore, the wording of the provision indicates that it applies to all states whose UIC programs have been approved, irrespective of the content of those programs.

10. We realize, of course, that these two provisions are nearly identical and that the amended rule 17–4.090(1) is based on section 120.60(6) of the Florida Administrative Procedure Act. Several factors, however, including differences in legislative history, may warrant different interpretations of the two provisions. These are issues to be decided by the Florida Supreme Court.

TION CONTROL PROGRAM, WHERE A HOLDER OF AN EXPLORATORY WELL CONSTRUCTION AND TESTING PERMIT HAS MADE A TIMELY APPLICATION FOR AN INJECTION WELL OPERATING PERMIT, DOES THE CONSTRUCTION AND TESTING PERMIT CONTINUE IN EFFECT PAST ITS EXPIRATION DATE UNTIL THE FLORIDA DEPARTMENT OF ENVIRONMENTAL REGULATION HAS ACTED ON THE PENDING APPLICATION?

We do not intend the particular phrasing of this question to limit consideration of the problems posed by the entire case. The court is at liberty to consider the problems and issues involved in this case as it perceives them to be. In order to assist the determination, the entire record, along with the briefs of the parties, shall be transmitted to the Supreme Court of Florida.

## III. CONCLUSION

We thus AFFIRM the district court's holding that the relevant inquiry in this case is whether existing Florida law, not limited to the state's EPA-approved UIC program, provides for the continuation of the Construction and Testing Permit. Because we believe that the remaining question is an issue of state law unanswered by controlling precedent, we CERTIFY the question to the Florida Supreme Court for review and decision.